1

2

3                    UNITED STATES DISTRICT COURT
                        DISTRICT OF IDAHO
4

UNITED STATES OF AMERICA,        )
5                                )
                  Plaintiff,     )   CR-07-127-C-EJL
6                                )
     vs.                         )   MEMORANDUM DECISION AND
7                                )   ORDER RE: DEFENDANT'S
ALVIN R. VAILE,                  )   MOTION TO SUPPRESS
8                                )   (DOCKET NO. ____)
                  Defendant.     )
9   ─────────────────────────────)

10      Before the Court is Alvin R. Vaile's Motion to Suppress. The

11   application of the exclusionary rule is a matter of law.

12   However, a district court is charged with determining the facts

13   upon which such rule is applied. *United States v. Crawford*, 372

14   F.3d 1048, 1053 (9th Cir. 2004). The Court is also responsible

15   for determining the credibility of witnesses and for determining

16   the weight to be given to the evidence.  The district court's

17   findings of fact in the context of a motion to suppress are then

18   reviewed for clear error.  *United States v. Gillyard*, 726 F.2d

19   1426, 1429 (9th Cir. 1984).

20      Having reviewed the entire written record and considered the

21   testimonial evidence from the evidentiary hearing on July 15,

22   2008, the Court grants in part, and denies in part, Vaile's

23   Motion to Suppress.

24   **A.  Facts**

25      Shortly after noon on August 25, 2006, Captain Tom Polek

26   ("Cpt. Polek") of the Nez Perce Tribal Police Department

27   MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

1   ("NPTPD") and Special Agent Douglas Hart ("S.A. Hart")

2   (collectively, "the officers") of the Federal Bureau of

3   Investigation ("FBI") went to the house where Vaile was living

4   (his mother-in-law's home).  The purpose of the visit was to

5   interview Vaile in conjunction with an investigation into an

6   alleged sexual assault of Channa Henry earlier that morning.  At

7   the time they arrived, Cpt. Polek was riding with S.A. Hart in

8   S.A. Hart's official FBI vehicle, an unmarked Ford Excursion SUV.

9   S.A. Hart and Cpt. Polek approached the house and knocked on the

10  front door.  When Vaile opened the door, S.A. Hart stated that he

11  was with the FBI and that there was a matter he needed to discuss

12  with Vaile.  S.A. Hart did not, however, identify any information

13  about the alleged sexual assault. At the time the officers

14  arrived, Vaile had just awakened and, to the officers, seemed not

15  to have showered. S.A. Hart told Vaile that they had an interview

16  room at the NPTPD office where they could speak privately.   S.A.

17  Hart then asked Vaile if he wanted to drive to the station or if

18  he would like a ride.  Vaile agreed to travel with the officers

19  in S.A. Hart's vehicle.  Vaile sat in the passenger seat during

20  the approximately five minute ride to the NPTPD office and was

21  not restrained during the ride.  Upon arriving at the NPTPD

22  station, the officers took Vaile through a side door into the

23  NPTPD's interview room, so that he did not have to enter the

24  interview room through the main area of the station.

25      Once in the interview room, the officers allowed Vaile to

26  sit in a chair nearest to the door.  Cpt. Polek and S.A. Hart

27  MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

then explained to Vaile that he was not under arrest and could leave at any time.  At that point, the officers for the first time told Vaile that Henry reported that Vaile had raped her earlier that morning.  The officers then told Vaile that they wanted to hear his version of the story, but they did not inform Vaile of his *Miranda*[1] rights.  Vaile was not placed under arrest at any time during the August 25, 2006 encounter. The interview lasted a little more than two hours.  During the interview, the officers offered Vaile a soft drink, which he accepted.  They also asked him to lift his shirt so that they could look for scratch marks, and he complied.

Vaile told the officers that he had been drinking at Henry's residence the prior evening with (1) his wife, (2) Henry, and (3) another adult female.  Vaile stated that, after driving his wife and the other individual home, he returned to Henry's residence to see if he could "get with" Henry.  Vaile admitted to entering Henry's home uninvited, but he knew that she was awake at that time.  Vaile stated that he immediately left Henry's residence after his efforts to kiss Henry were rejected.  Vaile adamantly denied that any sexual contact occurred between himself and Henry.

At that point, both Cpt. Polek and S.A. Hart exited the interview room for approximately five minutes.  Upon returning to the room, they informed Vaile that he had an opportunity to prove

---

[1]   *See Miranda v. Arizona*, 384 U.S. 436 (1966).

his innocence by taking a sexual assault examination.  The officers told Vaile that the examination would prove whether Vaile had sex with Henry. Given that Vaile had not showered that day, the examination could be performed. The officers told Vaile that, if in fact Vaile had sex with Henry, her DNA would still be on his body.

Upon hearing of the potential for a sexual assault examination, Vaile told the officers that he had engaged in sex with Henry, but that the sex was consensual.

During the interview, S.A. Hart asked Vaile if he would submit to a polygraph examination and explained that the process would entail specific questioning about the incident. Specifically, S.A. Hart told Vaile that the questioning would involve inquiries about whether the sex  was consensual or nonconsensual and that the questioning would last "a couple hours."  S.A. Hart told Vaile that the actual examination would not last too long but that the interviewing in conjunction with the examination would take more time.

At approximately 2:40 p.m., Vaile terminated the interview and S.A. Hart drove him home.  Subsequently, Vaile retained attorney John Mitchell to represent him in any further proceedings.  S.A. Hart spoke with Mitchell approximately three times on the telephone about the polygraph examination.  During the first telephone call between S.A. Hart and Mitchell, S.A. Hart explained Henry's allegations against Vaile and inquired whether Vaile was willing to take a polygraph examination.  S.A.

1    Hart explained to Mitchell that the actual polygraph examination

2    was relatively brief but that the entire interview process could

3    take a "couple" hours.  S.A. Hart did not advise Mitchell that

4    the interview process potentially could include a post-polygraph

5    interrogation.  Vaile subsequently agreed to the polygraph

6    examination.  Mitchell and S.A. Hart agreed that Vaile's

7    polygraph would take place on September 12, 2006.

8         Mitchell and Vaile arrived as scheduled at the FBI's field

9    office in Lewiston, Idaho for the polygraph examination.  Special

10   Agent Stephen Carter ("S.A. Carter") of the FBI was present that

11   day to conduct the examination.  After making general

12   introductions, Mitchell informed Vaile and S.A. Hart that he had

13   other business that afternoon and that he would be available by

14   cell phone.  At that point, Mitchell left the FBI's offices and

15   did not return for approximately 1.5 to 2 hours.

16        Prior to utilizing the polygraph, S.A. Carter provided Vaile

17   with an Advice of Rights form,[2] which informed Vaile of his

18   *Miranda* rights, and a form entitled "Consent to Interview with

19   Polygraph."[3]  Vaile signed both documents at approximately 1:10

20   _____

21        [2]  The Advice of Rights form stated that "Before we ask you
     any questions, you must understand your rights.  You have the right

22   to remain silent.  Anything you say can be used against you in
     court.  You have the right to talk to a lawyer for advice before we

23   ask you any questions.  You have the right to have a lawyer with
     you during questioning.  If you cannot afford a lawyer, one will be

24   appointed for you before any questioning if you wish.  If you
     decide to answer questions now without a lawyer present, you have

25   the right to stop answering at any time."

26        [3]  Among other things, this form advised Vaile as follows:
     "You have the right to refuse to take the polygraph test.  If you

27   MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

1   p.m.  At the time S.A. Carter provided Vaile with the forms, S.A.

2   Carter told Vaile that the polygraph examination was an entirely

3   voluntary process, that he was welcome to consult with his

4   attorney during or after the test, and that he had the right to

5   stop the test at any time. However, S.A. Carter did not read or

6   explain the forms to Vaile.

7       S.A. Carter then initiated the polygraph examination.  The

8   polygraph examination concluded at approximately 2:17 p.m.  S.A.

9   Carter removed the polygraph equipment from Vaile's body a few

10  minutes later.  S.A. Carter determined, from his review of

11  Vaile's polygraph results, that Vaile's responses were indicative

12  of deception.  S.A. Carter then spent the next approximately two

13  hours interrogating Vaile in an attempt to "confirm [Vaile's]

14  deception."  During the post-polygraph interrogation, Mitchell

15  returned to the FBI's offices; however, Mitchell did not attempt

16  to speak with his client. Instead, he visited with Cpt. Polek and

17  another FBI agent in the office.  At no point did Vaile attempt

18  to contact Mitchell by telephone.

19      Vaile eventually admitted to having sex with Henry while she

20  was unconscious.  At approximately 4:25 to 4:30 p.m., S.A. Carter

21  called S.A. Hart into the interview room and told S.A. Hart that

22  Vaile had admitted to having sex with Henry while she was

23  unconscious.  After having an opportunity to confirm the details

24

25  agree to take the polygraph test, you have the right to stop the
26  test at anytime.  If you agree to take the polygraph test, you have
    the right to refuse to answer any question."

27  MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

1  of what had transpired, S.A. Hart located Mitchell and returned

2  with him to the interview room.  Vaile then acknowledged (by

3  nodding his head) the confession in front of Mitchell, S.A. Hart,

4  and S.A. Carter.  At that point, Mitchell and Vaile departed the

5  FBI's office.

6        Neither S.A. Hart nor S.A. Carter provided Mitchell with

7  copies of the waiver forms or explained to Vaile and/or Mitchell

8  that Vaile would be subjected to a post-polygraph interrogation

9  if his responses indicated deception.  Mitchell testified that he

10  would not have allowed such an interrogation to occur had he

11  known in advance that it would take place.  Moreover, at the

12  hearing, the testimony demonstrated that a polygraph examination

13  does not necessarily include a post-polygraph interrogation.

14  According to Ted Pulver, whose testimony the court finds to be

15  credible, the post-polygraph interrogation is completed for the

16  purpose of obtaining a confession, and is not a necessary

17  component of the polygraph process.  S.A. Carter testified that

18  in some circumstances he does not include the post-polygraph

19  interrogation, though it was his normal practice to do so.

20  **B.  Discussion**

21        1.  <u>Vaile's August 25, 2006 incriminating statements</u>

22        "The procedural protections afforded by [*Miranda*] are

23  designed to secure an accused's privilege against self-

24  incrimination and are triggered only in the event of a custodial

25  interrogation."  *United States v. Wauneka*, 770 F.2d 1434, 1438

26  (9th Cir. 1985).  "Whether a defendant was the focus of a

27

1  custodial interrogation is a factual determination that must be

2  made on a case-by-case basis." *Id.* "A defendant is in custody

3  when, based upon a review of all the pertinent facts, 'a

4  reasonable innocent person in such circumstances would conclude

5  that after brief questioning he or she would not be free to

6  leave.'" *Id.* (quoting *United States v. Booth*, 669 F.2d 1231,

7  1235 (9th Cir. 1981).  The five factors relevant to whether a

8  defendant is in custody are "(1) the language used to summon the

9  individual, (2) the extent to which the defendant is confronted

10  with evidence of guilt, (3) the physical surroundings of the

11  interrogation, (4) the duration of the detention, and (5) the

12  degree of pressure applied to detain the individual." *Wauneka*,

13  770 F.2d at 1438.  Based on the record and the testimony, the

14  court concludes that Vaile was not in custody when he made the

15  incriminating statements to the officers on August 25, 2006.

16      First, the officers did not demand that Vaile accompany them

17  to the station.  Instead, S.A. Hart informed Vaile that he had a

18  matter that he would like to discuss with Vaile and requested

19  that Vaile accompany him and Cpt. Polek to the NPTPD station

20  (where they could meet privately).  The officers did not demand

21  that Vaile accompany them or exert any type of physical force to

22  accomplish their objective.  Thus, the first factor – the type of

23  language used – weighs in favor of a finding that Vaile was not

24  in custody at the time he made the incriminating statements on

25  August 25, 2006.

26      Second, although the officers informed Vaile that Henry

27  MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

1  reported to them that he had allegedly raped her, the officers

2  did not confront Vaile with a copy of Henry's written statement,

3  which they had already obtained.  Nor did they confront him with

4  any other evidence of the crime. From listening to the testimony

5  at the hearing, it seemed the officers were anything but

6  accusatory and were instead allowing Vaile to confirm or deny the

7  story. Although this factor is closer than the first, it does not

8  support a finding that Vaile was in custody when he made the

9  incriminating statements on August 25, 2006.

10      Third, the physical surroundings of the interrogation do not

11  support a finding of custody.  Vaile voluntarily rode with the

12  officers to the NPTPD station.   The officers took Vaile into the

13  station through a side door so that he did not have to enter the

14  interview room through the main area of the station.  He was

15  never physically restrained or told that he was not free to

16  leave.  The officers allowed Vaile to sit near the door and did

17  not position themselves to block the exit.  Additionally, the

18  officers asked Vaile if he wanted a soft drink, which he

19  accepted.  Thus, the physical surroundings of the interrogation

20  do not support a finding that the interview was custodial, even

21  though it took place in the NPTPD interview room.

22      Fourth, the duration of the detention was not unreasonable

23  and does not support an inference that Vaile was in custody.

24  Vaile was with the officers for a little more than two hours, but

25  knew that S.A. Hart would take him home any time he wanted to

26  leave.  Moreover, when Vaile indicated that he wanted to

27  MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

1   terminate the interview, the officers promptly did so and took

2   him home.   Therefore the length of the detention does not support

3   a finding that Vaile was in custody.

4        Fifth, the officers did not use an undue amount of pressure

5   to detain Vaile.   To the contrary, they asked Vaile if he would

6   speak with them and he voluntarily complied.   The officers

7   offered to allow Vaile to drive himself to the NPTPD station in

8   his personal vehicle; he preferred to ride in their car.   The

9   officers allowed Vaile to travel with them in the front seat of

10  S.A. Hart's vehicle while unrestrained.   The officers told Vaile

11  that he was free to leave at any time and drove him home when he

12  indicated a desire to terminate the interview.   Therefore the

13  final factor does not support a finding that Vaile was in custody

14  at the time he made the August 25, 2006 statements.

15       As a consequence, Vaile's motion to suppress the August 25,

16  2006 incriminating statements is DENIED.

17       2.   Vaile's September 12, 2006 incriminating statements

18       "[O]nce a suspect invokes his right to counsel, he may not

19  be subjected to further interrogation until counsel is provided

20  unless the suspect himself initiates dialogue with the

21  authorities." *Wyrick v. Fields*, 459 U.S. 42, 45-46 (1982).   When

22  a suspect initiates a meeting with police, the suspect can waive

23  the right to counsel.   *Id.* at 46.   However, that waiver must be

24  "'knowing and intelligent and found to be so under the totality

25  of the circumstances, including the necessary fact that the

26  accused, not the police, reopened the dialogue with the

27

MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

1   authorities.'" *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477,

2   486 n.9 (1981)).

3       In determining whether a defendant waived his or her *Miranda*

4   rights relative to a post-polygraph interrogation, courts should

5   consider (1) which party requested the polygraph; (2) whether the

6   defendant was represented by counsel; (3) whether the defendant

7   was adequately informed about the post-polygraph interrogation;

8   and (4) whether the post-polygraph interrogation was conducted by

9   the same individual as the one conducting the polygraph

10  examination.  *See Gillyard*, 726 F.2d at 1429.

11      In *Wyrick*, the post-polygraph interrogation occurred only

12  after the FBI agent removed the polygraph equipment from the

13  defendant's body and after the agent informed the defendant that

14  his answers were indicative of deception.  459 U.S. at 44.  The

15  Supreme Court held that, based on the totality of the

16  circumstances, it was clear that the defendant effected a knowing

17  and intelligent waiver of his right to counsel.  *Id.* at 47-49.

18  In reaching that conclusion, the Court noted that "the questions

19  put to [the defendant] after the examination would not have

20  caused him to forget the rights of which he had been advised and

21  which he had understood moments before."  *Id.* at 49.

22      As the government notes, Vaile was not in custody at the

23  time he submitted to the polygraph examination and post-polygraph

24  interview.  Vaile had, however, invoked his Fifth Amendment right

25  to counsel and the government must therefore prove that he

26  voluntarily waived his right to counsel during the post-polygraph

27  MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

1   interrogation.  *See Wyrick*, 459 U.S. at 45-46 (1982).  The

2   government argues that Vaile did waive this important right,

3   because he signed the Advice of Rights form and executed the

4   Consent to Interview by Polygraph, which, according to the

5   government, effected a waiver of Vaile's *Miranda* rights,

6   including the right to counsel during any police interrogation.

7       The Court disagrees when it applies the factors set forth in

8   *Gillyard.*

9       It is undisputed that S.A. Hart requested that Vaile

10  complete a polygraph examination. Vaile consented to take the

11  test, because he believed that, if he passed the polygraph

12  examination, he would not be charged for the crime. The Court

13  understands that S.A. Hart knows that he could not make such a

14  promise.  However, it was clear that "not being charged with the

15  crime" was the lure to get Vaile and Mitchell to agree to the

16  test. Thus the first factor weighs in favor of a finding that the

17  waiver was involuntary.  This is similar to *Gillyard*, where the

18  agent requested that the defendant take a polygraph, and the

19  defendant later agreed to do so.  726 F.2d at 1429.

20      The second factor, however, indicates that the waiver was

21  voluntary. There is no dispute that Vaile was represented by

22  Mitchell, an attorney, and that Mitchell appeared at the FBI's

23  office with Vaile for purposes of the interview.

24      The third factor supports a finding that the waiver was

25  involuntary. Vaile and his counsel were not adequately informed

26  about the post-polygraph interrogation. The officers never told

27
MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

1  Mitchell and/or Vaile that they intended to subject Vaile to

2  extensive questioning after the polygraph examination was

3  completed. The officers never provided the forms (they expected

4  Vaile to sign) to Vaile's counsel. At the hearing, Mitchell

5  testified that he never would have allowed his client to submit

6  to an un-counseled post-polygraph interrogation had he known

7  about the officers' plans in advance.  The court specifically

8  finds this testimony to be credible. The Consent to Interview

9  with Polygraph form says nothing about a post-polygraph

10 interrogation.  It only references being "examined by means of

11 the polygraph."  There is no indication in the written forms to

12 suggest that the officers notified Vaile about the intended

13 procedure. While it is clear that the officers told Mitchell and

14 Vaile that the entire process could take a couple hours, no one

15 discussed the procedure to be followed. The officers and Vaile

16 and Mitchell never had a common understanding of what would be

17 done in the examination.

18      The Court also finds substantial evidence that the officers

19 went beyond the scope of a standard polygraph examination (and

20 thus beyond what Vaile thought he was agreeing to do).  The

21 officers engaged in the uncounseled interrogation of Vaile for

22 two hours after S.A. Carter determined that Vaile was being

23 deceptive. Expert Pulver testified that the post polygraph

24 interrogation here went far beyond what should normally happen in

25 such an examination. As a result of this additional

26 interrogation, which arguably is not a necessary component of the

27 MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

1   polygraph examination to which Vaile agreed, the officers did not

2   adequately inform Vaile and his counsel, Mitchell about the

3   proceedings. Therefore, Vaile did not knowingly waive his right

4   to counsel during this critical moment.

5       In *Gillyard,* the officers "made it clear to the defendant

6   that he was not merely taking a polygraph examination but was

7   going to be asked questions about a specific offense under

8   investigation."  726 F.2d at 1429.  Those facts were not clearly

9   communicated here.

10      The fourth factor supports the finding that the waiver of

11  the right to counsel was voluntary, because S.A. Carter conducted

12  both the polygraph examination and the post-polygraph

13  interrogation.  *See id.*

14      Given this discussion of the four factors, and given the

15  totality of the circumstances, the Court concludes that the

16  waiver of the right to counsel was not voluntary.  The officers

17  knew that Vaile was represented and nevertheless subjected him to

18  an uncounseled two hour interrogation concerning whether he

19  sexually assaulted Henry.  Based on the evidence in the record

20  and the testimony at the suppression hearing, the Court concludes

21  that the government has failed to meet its burden of proving that

22  Vaile's waiver of the right to counsel for the post-polygraph

23  interrogation was knowing and voluntary.  As a result, the court

24  GRANTS Vaile's motion to suppress the September 12, 2006

25  incriminating statements.

26  **ORDER**

27  MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS

1    Based on the foregoing, Vaile's Motion to Suppress is

2   granted in part and denied in part.  The Court DENIES the motion

3   to suppress as it relates to the August 25, 2006 incriminating

4   statements, and GRANTS the motion to suppress as it relates to

5   the September 12, 2006 incriminating statements following the

6   polygraph examination.

7

8                            DATED:  **August 18, 2008**

9

10

11   _____

12                            Honorable N. Randy Smith
                             Ninth Circuit Court of Appeals Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27